MEMORANDUM OPINION

No. 04-04-00921-CR

Javier DE LA ROSA,

Appellant

v.

The STATE of Texas ,

Appellee

From the 381st Judicial District Court, Starr County, Texas

Trial Court No. 04-CR-09

Honorable John A. Pope, III , Judge Presiding




Opinion by: Karen Angelini , Justice



Sitting: Catherine Stone , Justice

 Karen Angelini , Justice

 Rebecca Simmons , Justice



Delivered and Filed: July 26, 2006



AFFIRMED

 Javier De La Rosa was found guilty of murder and sentenced to forty years imprisonment. In his sole issue, he argues that
he was entitled to a charge on the lesser-included offense of manslaughter. We disagree and affirm the judgment of the trial court.





Background


 On January 2, 2004, Javier De La Rosa attended a late-night gathering with a group of men including four of De La Rosa's
long-term acquaintances. The gathering was held in a mutual friend's yard in a neighborhood familiar from childhood to
both De La Rosa and to the victim, Alfredo Zarate. Over several hours during the night, the men steadily drank alcohol and
consumed cocaine. Two eyewitnesses later testified that there were no fights, conflicts, or arguments among the men.

 De La Rosa had been seeing a woman for a short time and only recently had learned that the woman was married. De La
Rosa was worried that the woman's husband or a man associated with her might cause him trouble. In a taped statement and
during cross-examination at trial, De La Rosa admitted to having recently purchased a stolen handgun in Mexico for $250.
According to De La Rosa, immediately before the shooting, he had been hallucinating, had perceived people to be following
him, and had felt uneasy and nervous. 

 In the early hours of the morning, while the men were still gathered in the yard, De La Rosa pulled Zarate aside. Carlos
Flores, a witness, testified that De La Rosa asked Zarate if Zarate had been laughing at him. Immediately following this
exchange, De La Rosa pulled a loaded nine-millimeter Ruger pistol from the waistband of his pants, disengaged the safety,
placed the gun against Zarate's temple, and fired one shot into Zarate's head. According to Flores's testimony, after firing the
weapon, De La Rosa told Zarate that Zarate could "go ahead and go to hell." De La Rosa then got into his vehicle and drove
away.

 Those present placed a call for emergency help; Starr County EMS responded to the scene. According to testimony from a
first responder, Zarate was found lying on the ground with a gunshot wound to his head. After assessing his vital signs and
determining that he was still alive, the paramedics transported Zarate to Starr County Memorial Hospital where he later
died.

 Later that same day, in an area of southern Starr County, law enforcement officers discovered a vehicle matching the
description of De La Rosa's vehicle. The vehicle was parked in a wooded area along the Rio Grande river, appeared dusty,
and had a flat tire. In the vehicle, officers found a handgun and a plastic bag of cocaine. The vehicle was impounded. While
leaving the site where the vehicle was found, officers were called to the Rio Grande Port of Entry where De La Rosa had
been detained. De La Rosa appeared bruised and injured, but was lucid and aware of what had happened regarding the
shooting of Zarate. De La Rosa was taken to the Starr County Sheriff's Department where he was informed of his Miranda
rights and then chose to give a statement. De La Rosa admitted to committing the offense, but claimed in a videotaped
confession, "I don't have a reason to do it," and expressed that he was not in his right mind because of several days of
abusing cocaine.

 De La Rosa was indicted for the offense of murder. The indictment charged that De La Rosa did intentionally or knowingly
cause the death of Alfredo Zarate by shooting him with a deadly weapon. 

Lesser-Included Offense


 According to De La Rosa, he was entitled to a charge on the lesser-included offense of manslaughter. A defendant is
entitled to the submission of a lesser-included offense jury charge only if the Aguilar/Rousseau two-pronged test is met. See
Feldman v. State, 71 S.W.3d 738, 750 (Tex. Crim. App. 2002); see also Rousseau v. State, 855 S.W.2d 666 (Tex. Crim.
App. 1993); Aguilar v. State, 682 S.W.2d 556 (Tex. Crim. App. 1985). First, the offense must be a lesser-included offense
of the offense charged. Feldman, 71 S.W.3d at 750; Rousseau, 855 S.W.2d at 672; Aguilar, 682 S.W.2d at 558.
Manslaughter is a lesser-included offense of murder. Cardenas v. State, 30 S.W.3d 384, 392 (Tex. Crim. App. 2000). Thus,
the first prong of the test has been met.

 The second prong requires that the record contain some evidence that would permit a rational jury to find that the defendant
is guilty only of the lesser-included offense. Feldman, 71 S.W.3d at 750. In other words, there must be some evidence from
which a rational jury could acquit the defendant of the greater offense while convicting him of the lesser-included offense.
Id. at 750-51. The evidence must establish the lesser-included offense as a valid rational alternative to the charged offense.
Id. at 751.

 A person commits manslaughter if he recklessly causes the death of an individual. See Tex. Pen. Code Ann. § 19.04(a)
(Vernon 2003). A person acts recklessly when he is aware of but consciously disregards a substantial and unjustifiable risk
that the circumstances exist or the result will occur. See id. § 6.03(c). Therefore, for a defendant to be entitled to a jury
charge on manslaughter, the record must contain some evidence that the defendant did not intend to kill andthat the
defendant acted recklessly while ignoring a known risk. See Kennedy v. State, No. 02-02-00376-CR, 2006 WL 820015, at
*3 (Tex. App.--Fort Worth Mar. 30, 2006, no pet. h.) (en banc);Munoz v. State, 932 S.W.2d 242, 245 (Tex.
App.--Texarkana 1996, no pet.).

 A pistol is a deadly weapon per se when fired at a victim at close range. Munoz, 932 S.W.2d at 245; see Tex. Pen. Code
Ann. § 1.07(a)(17)(A) (Vernon 2003) (defining deadly weapon as a firearm). Intent to kill may be inferred from the use of a
deadly weapon in a deadly manner.Adanandus v. State, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993); Munoz, 932 S.W.2d
at 245. In the absence of other evidence, the jurors may presume intent to kill from the use of a deadly weapon. Munoz, 932
S.W.2d at 245; see Adanandus, 866 S.W.2d at 215 ("Further, if a deadly weapon is used in a deadly manner, the inference is
almost conclusive that the defendant intended to kill.") (quotations and alterations omitted); see also Jones v. State, 944
S.W.2d 642, 647 (Tex. Crim. App. 1996) ("The jury may infer the intent to kill from the use of a deadly weapon unless it
would not be reasonable to infer that death or serious bodily injury could result from the use of the weapon."). The accused
may rebut this presumption with other evidence. Munoz, 932 S.W.2d at 245.

 Here, the evidence shows that De La Rosa purchased the stolen pistol, that it was loaded, and that De La Rosa pointed the
pistol at Zarate's head and fired at point-blank range. According to a witness's testimony at trial, De La Rosa then told
Zarate to go to hell. See Kincaid v. State, 150 Tex. Crim. 45, 46, 198 S.W.2d 899, 900 (1946) (noting that because direct
testimony will seldom prove intent, intent may be inferred from the acts, words, and conduct of the defendant). Further,
Richard Hitchcock, forensic firearms and tool marks examiner for the Texas Department of Public Safety Crime
Laboratory, testified as to the following about the nine-millimeter handgun fired by De La Rosa: The gun had an
ambidextrous external safety that was operational, meaning that the gun would not fire when in the safe position.
Furthermore, testing showed that the hammer could not be "pushed off," nor could it be made to fall by jarring the gun. (1)

 In support of his argument that he was entitled to a charge on manslaughter, De La Rosa points to testimony that by the
night in question, he had been taking cocaine for "about four or five days," that he had not recently slept, and that up until
the moment he shot Zarate, there did not appear to be any conflict between him and Zarate. None of this, however, is
evidence that De La Rosa acted recklessly when he pointed the gun at Zarate's head and fired.

 De La Rosa also points to his own testimony. In his confession to police, De La Rosa stated, "I didn't have the intention to
use [the gun]." At trial, in explaining his statement, De La Rosa testified, "I wasn't going to use [the gun]. I just went to
drink. I didn't expect nothing [sic] like that was [sic] going to happen." During cross-examination, he testified to the
following:

 Q: When you say to the officer that you had it in your waist, I'm talking about the handgun, and it was ready to go, what did
you mean, sir?



 A: I had it ready.

 Q: But what do you mean when you have it ready?

 A: Got a bullet on top.

 Q: So you knew it was loaded?

 A: Yes, sir.

 Q: And you also made the statement that you knew it was on safe?

 A: Yes, sir.

 Q: You remember that?

 A: Yes, sir, I remember that.

 Q: Okay. And you said you took it off safe? You said that in the statement, is that true?



 A: I said that.

* * *


 Q: You had been drinking and using cocaine and you had the keys to your car, could they be talking about you going to
your car, sir?



 A: I don't get the question.



 Q: I didn't hear the answer.



 A: What do you mean by that?



 Q: I'm asking you the question again. When you said . . . you were going to get hurt or you were going to get messed up,
could they have been talking about that you were going to drive your car?



 A: No, not in my mind.



 Q: Did you ask them?



 A: No. He didn't say nothing. He just nod his head.



 Q: That was enough to get your gun out and shoot somebody?



 A: Well, this guy just made a nod, he said to these other guys, and he scoot down, I'm coked up and all these things [are]
going through my mind.



 Q: And that was enough to kill Freddy?



 A: I didn't want to kill him. It happened. When I took the gun out it happened. I never went to kill nobody [sic] over there.



 Q: Let me ask you this. Why couldn't you instead of pointing it to the guy's head, why couldn't you point it to his leg?



 A: I wasn't thinking that. I just took it out.



 Q: Well, but why would you point it to his head?



 A: He was there beside me. I don't know. When I took it out, I took it out and it happened like I'm telling.

 De La Rosa claims that this testimony is evidence of recklessness. We disagree. De La Rosa's testimony is evidence that he
did not go to the gathering with the intent of killing Zarate, but it is not evidence that he acted recklessly when he took out
the gun, turned the safety off, pointed the gun at Zarate's head at close range, and pulled the trigger. There is no evidence
which would permit a rational jury to find that De La Rosa is guilty only of manslaughter. 

Conclusion


 Because a rational trier of fact could not determine from the evidence presented that De La Rosa was only guilty of the
lesser-included offense of manslaughter, we find no error on the part of the trial court and affirm its judgment.

 Karen Angelini , Justice



Do not publish

1. At trial, Hitchcock testified, "I could not get the hammer to fall without intentionally pulling the trigger."